UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STACIE WIGGANS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-2256 |
| ) | EEOC No. 563-2018-03025 |
| MCANANY, VAN CLEAVE ) | KHRC Docket No. 40865-19 |
| & PHILLIPS, P.A., ) | |
| ) | |
| and ) | |
| ) | |
| JAMES P. WOLF, ) | |
| Serve at Place of Employment: ) | |
| 10 East Cambridge Circle Drive, Suite 300 ) | |
| Kansas City, KS 66103 ) | |
| ) | |
| and ) | |
| ) | |
| PHILLIP M. SANDERS, ) | |
| Serve at Place of Employment: ) | |
| 10 East Cambridge Circle Drive, Suite 300 ) | |
| Kansas City, KS 66103 ) | |
| ) | |
| Defendants. ) | |

## CIVIL COMPLAINT ATTACHMENT

I. **PARTIES TO THIS CIVIL ACTION.**

    A. **Plaintiff.** Stacie Wiggans ("Plaintiff").

    B. **Defendant.** McAnany, Van Cleave & Phillips, P.A. ("Defendant MVP").

    C. **Additional Defendants.** James P. Wolf ("Defendant Wolf"); Phillip M. Sanders ("Defendant Sanders").

II. **JURISDICTION.**

    A. **1-3.** See Civil Complaint.

        4. The third-named Defendant above is a citizen of the State of Kansas.

    B. **1-3.** See Civil Complaint.

### III.    STATEMENT OF CLAIM(S).

1. All Defendants employed Plaintiff as a legal administrative assistant, in their Kansas City, Kansas, office and occasionally in their Kansas City, Missouri, office from December 28, 2016, through October 10, 2018.

2. Plaintiff reported to Defendants the discrimination, hostile work environment, harassment based on Plaintiff's transgender son's sex, her age, and disability she experienced; after filing a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission and Kansas Human Rights Commission she was terminated.

3. Plaintiff was treated differently than her counterparts, by not receiving adequate back-up when out of the office and not being allowed to make up hours.

4. Defendant Sanders informed Plaintiff during her employment that Defendant Wolf was "difficult" and "she just needed to do a better job." He insisted on no written documentation and admitted he did not read emails pertaining to his human resources duties.

5. Prior to filing the Charge, Plaintiff was allowed to make up time, after she was not, but her counterparts were allowed to do so.

6. On August 21, 2018, at approximately 9:00 a.m., Defendant Wolf came to Plaintiff's desk (in front of co-workers) and began belittling and bullying Plaintiff. He appeared to be in an altered state. Plaintiff smiled, tried to appease him, and informed human resources of the incident.

7. Thereafter, Defendant Wolf phoned Plaintiff's desk and regarding an incorrect document, but it was impossible to understand him, so Plaintiff went to his office.

8. Defendant Wolf became increasingly angry as Plaintiff explained what document he was holding. He wanted "explanations, not excuses." His face became distorted, he

told Plaintiff angrily "don't talk to me like that and stop being frustrated." Plaintiff said she "wasn't frustrated, but he did seem frustrated" and she "didn't want to be talked to like that either, because you're was getting hateful." Defendant was shaking and looked like he wanted to kill someone, with his bottom lip jutted out, crazy, red-rimmed eyes, and slammed his fists down on his desk. Plaintiff said she was going back to her desk, but he said she was not leaving his office, then drew his right fist back, as if to hit the Plaintiff, gritting his teeth, balling up his other hand.

9. Plaintiff felt unsafe and said she was leaving his office. As she was leaving, Defendant Wolf pointed to the door and said, "go, just go" and appeared to still be altered (Plaintiff had dealt with him in an altered state previously). He slammed the door behind her.

10. Plaintiff returned to her desk to work, but could not stop crying, hyperventilating, felt nauseous, started getting blurry vision, and before long, a massive headache.

11. Plaintiff suffers from Lupus, IBS, migraines, depressions, anxiety, and other health conditions that are exasperated by stress.

12. On August 21, 2018, at 5:28 pm, Plaintiff emailed human resources about the incidents and her health issues. The email offered the solution of being reassigned as an overflow secretary and working from home, as did some of her counterparts.

13. Plaintiff missed work and had to take unpaid days and was taken by ambulance to the emergency room because of the situation.

14. Plaintiff's workstation was located at the entrance to the third floor offices, so she was forced to see Defendant Wolf daily. He often stopped near her workstation to converse with other staff, creating tension and triggering health issues.

15. Plaintiff initially agreed to meet with Defendant Sanders, but because of the tone of prior meetings and his aggressive demeanor, she decided it was in her best interests to communicate about this situation via email.

16. Defendant Sanders did *not* want to communicate via email.

17. Defendant Wolf was reassigned on August 27, 2018; however, Plaintiff continued to transcribe his dictation on a regular basis.

18. Plaintiff's Charge with the EEOC/KHRC was filed on September 17, 2018 (Exhibit A) (Exhibit B: Right to Sue).

19. On September 19, 2018, Defendant Wolf had another outburst at an unknown employee, loud enough to be heard at Plaintiff's desk, triggering her health issues, and forcing her to leave early.

20. Plaintiff was relocated to the first floor on September 20, 2018.

21. Defendants either denied or ignored Plaintiff's requests to be moved away from Defendant Wolf, until after the Charge was filed on September 17, 2018.

22. On September 27, 2018, Plaintiff was notified her transgender son no longer had pharmacy coverage. Upon further investigation by Plaintiff, it was discovered that all of her insurance benefits had been cancelled because the firm insurance providers showed her termination date as September 27, 2018.

23. Plaintiff immediately contacted human resources, who suggested *she* call the insurance company. In addition, many of Plaintiff's family's benefits were being denied.

24. Defendant MVP was a self-insured company in 2018, and Plaintiff understood there was discretion by the firm over payment of benefits. Plaintiff's family had medical benefits that should have covered at 100%, as the family deductible had been met, but benefits continued to be denied, leaving thousands of dollars on Plaintiff's family's credit reports.

25. On or around September 27, 2018, Plaintiff verbally informed Defendant Sanders that Defendant MVP's insurance company's attorneys requested information regarding Plaintiff's transgender son's medical issues. Defendant Sanders stated that *"everyone in the firm is getting them, just toss them."*

26. On Monday, October 8, 2018, at 6:24 p.m., Defendant Sanders emailed Plaintiff's work email that she was terminated and requested a meeting at 9 a.m. Plaintiff agreed.

27. Plaintiff arrived to work as usual on Tuesday, October 9, 2018. Defendant Sanders was notified that she was there for the 9:00 a.m. meeting several times.

28. Humiliated, Plaintiff performed her overflow duties the rest of the day. Defendant Sanders did not show but requested another 9 a.m. meeting. Plaintiff again agreed.

29. On October 10, 2018, at 11:45 a.m., Woods arrived at the Kansas MVP office and said Defendant Sanders would be there shortly; he arrived a few minutes before noon.

30. At the termination meeting ("meeting"), Defendant Sanders informed Plaintiff that if she executed the Separation Agreement, which was face-down on the table, under his hand, Defendants would not dispute unemployment, would agree to a small severance, benefits would continue until the end of the month, and they would provide a good recommendation. If not, they would not agree to any of these things, and benefits would cease immediately.

31. Plaintiff questioned the validity of only giving dates of employment when prospective employers inquired in the future and was arrogantly informed by Defendant Sanders

that Defendants did *not* have to merely give dates, they could say anything they wanted when prospective employers called them in the future.

32. Plaintiff refused to be coerced into executing the Separation Agreement. Defendant Sanders then told her to sign and date the back of the last page of the Separation Agreement, and she reiterated her refusal. At this point, Defendant Sanders informed Plaintiff she was "free to go" and waved her out of the room.

33. On October 10, 2018, around 2 p.m., Defendant Sanders emailed Plaintiff stating she had seven (7) days to reconsider the Separation Agreement and benefits ceased then.

34. Plaintiff has suffered stress and mental anguish since Defendants terminated her employment, in the form of trying to find new employment and the embarrassment she felt when explaining to potential employers that Defendants terminated her.

35. Plaintiff has experienced stress and mental anguish from not having enough income to pay her bills, has days when she cries continuously, suffers from migraines, IBS, and is severely depressed, aggravating her Lupus, which is made worse by stress.

36. Plaintiff believes she has experienced difficulty finding another full-time position because she answers questions honestly in her applications and/or Defendants (and possibly representatives of MVP) provide derogatory information when inquiries are made.

IV. **RELIEF**. Plaintiff seeks relief in the form of an award for damages for lost wages, in the amount of $222,976.00 for five-years front-pay damages (intended to compensate for continuing future effects, until victim can be made whole); $25,996.00 for back-pay damages; $100,000.00 in emotional distress and mental anguish for compensatory damages; $75,000.00 for punitive damages as to the hostile work environment; $40,000.00 for damages related to sex and age discrimination and harassment of Plaintiff (age 40+), and her transgender son for compensatory

6

damages; $75,000.00 as to punitive damages to deter future retaliatory conduct; and $80,000.00 for future lost benefits as outlined below. Plaintiff also seeks payment of all past due health care expenses for Plaintiff and her family (to be determined and paid by the insurance third-party administrator); and Plaintiff prays for adjustments to account for the additional time that has passed between the termination date of October 10, 2018, at 12:00 p.m. and the date of the judgment and to recover all reasonable attorneys' fees, including expert fees, and such other relief as the court deems just and proper.

**V.-VI.** See Civil Complaint

**VII.   DO YOU CLAIM PUNITIVE MONETARY DAMAGES?** Yes

1. Plaintiff planned to retire from Defendant MVP.

2. Plaintiff's last hourly wage during her employment with Defendants was $21.44 per hour at 37.50 hours per week ($41,808.00 annually), but she typically worked 40 hours per week ($44,595.20 annually) or more until the Charge was filed. Not including OT or raises or bonuses.

3. Defendants provided Plaintiff certain employee benefits, including health insurance, a matching 401K program, paid time off, administrative personal days, and sick days. Plaintiff estimates the value of her lost benefits as at least $80,000.00.

4. Plaintiff believes that she has experienced difficulty finding another full-time position in any field because she answers questions honestly in her applications (*i.e.*, she informs potential employers Defendants terminated her) and/or Defendants (or possibly their representatives) provide derogatory remarks when contacted by prospective employers.

5. Plaintiff has and continues to sustain emotional distress from Defendants' discriminatory practices with malice or with reckless indifference to Plaintiff's federally protected

rights (sex, age, retaliation, being treated differently than other employees), harassment, and termination of her employment because of retaliation for filing with the EEOC.

6. Plaintiff has endured stress from not having sufficient funds to pay her bills and bill collectors calling her and suffers days of continuous crying and despair, with feelings of severe depression.

7. Plaintiff seeks compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

8. Plaintiff alleges these awards are necessary to punish Defendants for their failed handling of her complaints and to deter them from engaging in future similar conduct and as punishment for the way Defendants terminated Plaintiff's employment in a retaliatory manner.

9. Defendants' lawless conduct has undoubtedly harmed Plaintiff in finding employment, her credit score, as well as her children's, and in finding an attorney to represent her in this matter.

    **VIII.**   **ADMINISTRATIVE PROCEDURES.** See Civil Complaint.

    **IX.**   **RELATED LITIGATION.** See Civil Complaint.